# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Fairview Health Services,<br><br>        Plaintiff,<br><br>v.<br><br>Quest Software, Inc. et al.,<br><br>        Defendants. | Case No. 20-cv-01326 (SRN/LIB)<br><br><br>**ORDER** |

John Rock and Kathryn A. Stephens, Rock Hutchinson, PLLP, 120 South Sixth Street, Suite 2050, Minneapolis, MN 55402, for Plaintiff.

Benjamin W. Hulse, Blackwell Burke PA, 431 South Seventh Street, Suite 2500, Minneapolis, MN 55415; and Bradford J. Axel and Theresa Wang, Stokes Lawrence, P.S., 1420 Fifth Avenue, Suite 3000, Seattle, WA 98101, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion to Transfer Venue [Doc. No. 27] filed by Defendants Quest Software, Inc. and One Identity, LLC, and the Motion to Dismiss [Doc. No. 21] filed by Plaintiff Fairview Health Services. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **DENIES** both motions.

## I.        BACKGROUND

This dispute arises out of a software transaction between Fairview Health Services (hereafter, "Fairview") and Quest Software, Inc. and One Identity, LLC (collectively, "Quest"). Beginning in 2004, Fairview purchased licenses for Quest's Active Roles

software, a program which "facilitate[s] the administration and management of a company's information technology accounts." (Am. Compl. [Doc. No. 14], at ¶ 16.) The transaction between Fairview and Quest included two components: First, Fairview purchased perpetual licenses to use the Active Roles software; and second, Fairview signed annual "maintenance services" agreements, which entitled Fairview to various forms of technical support as well as software updates. (*See* Rock Decl. [Doc. No. 57], Ex. A, at §§ 2, 10 (2004 Software License Agreement between Fairview and Quest).) Fairview continued purchasing additional licenses periodically, and paying for maintenance services annually, through 2019. (*See* Am. Compl. ¶¶ 16-19, 29.)

In December 2019, Fairview notified Quest that it would not renew its maintenance services for the following year. (*Id.* ¶ 29.) Thereafter, Quest conducted an audit of Fairview's use of the Active Roles software, and allegedly found that Fairview had deployed the Active Roles software well in excess of the licenses Fairview had purchased. (*Id.* ¶¶ 30-32.) According to Quest, its audit revealed that Fairview had deployed the software using 69,064 licenses more than Fairview had purchased over the years. (*Id.* ¶ 32.) Based on the results of its audit and its interpretation of the parties' contracts, Quest concluded that Fairview owed a license fee of $4,183,178.85. (*Id.* ¶¶ 35, 37.) Fairview disputed the extent of its alleged over-deployment, and when the parties could not reach an agreement, brought this declaratory judgment action. (*Id.* ¶¶ 32-38.)

Fairview seeks a declaratory judgment clarifying: 1) whether the parties' 2004 Software License Agreement or their 2013 Software Transaction Agreement ("2004 SLA" and "2013 STA," respectively) governs Fairview's Active Roles licenses; 2) whether over-

2

deploying the Active Roles software beyond the allotted licenses constitutes a breach of the applicable agreement; 3) which accounts can be included in calculating whether an over-deployment has occurred; 4) how much Quest can charge for over-deployments; and 5) that Quest's exclusive remedy for an over-deployment is the right to invoice Fairview for the appropriate fees. (*Id.* ¶¶ 67-83.) Quest filed a counterclaim alleging that Fairview breached the 2013 STA and that Fairview's over-deployment renders it liable for copyright infringement, and seeking a declaratory judgment that the 2013 STA governs Fairview's deployment of the Active Roles software. (Answer & Countercl. [Doc. No. 16], at ¶¶ 42-52.)

After Fairview initiated this lawsuit, Quest filed a Motion to Transfer Venue, seeking to enforce a forum-selection clause in the 2013 STA. Fairview, in turn, filed a Motion to Dismiss Quest's breach of contract and copyright infringement counterclaims. Both motions require the Court to interpret the 2004 SLA and 2013 STA, as well as various purchase quotations signed by Fairview, which are either attached to or embraced by the pleadings. Accordingly, the Court next reviews the record pertinent to these agreements.

### A.      2004 Software License Agreement

In 2004 and 2005, Fairview purchased 18,101 licenses for the Active Roles software from Quest. (Am. Compl. ¶ 17.) These purchases were governed by a standard-form 2004 Software License Agreement, which provided:

> Subject to the terms and conditions of this Agreement, . . . Quest hereby grants to Licensee, and Licensee accepts from Quest, a perpetual, non-exclusive, non-transferrable and non-sublicensable right to use the Software described on the applicable Quotation Form. . . .

(Rock Decl., Ex. A ("2004 SLA"), at § 2.) In addition, the 2004 SLA defined "Software" to include "corrections, enhancements, and upgrades to the Software that Quest may make available pursuant to Section 10 below." (*Id.* § 1(e).)

Section 10 of the 2004 SLA addressed "maintenance services," which included various forms of technical support. (*Id.* § 10.) The maintenance services provision contemplated that Fairview would pay an annual fee in exchange for twelve months of the described technical support, and then the agreement would automatically renew to provide another twelve months of support until canceled by the parties. (*See id.*) One of the "maintenance services" was:

> Quest shall make available to Licensee new versions and releases of the Software, including Software corrections, enhancements and upgrades, if and when Quest makes them generally available without charge as part of Maintenance Services for the Software.

(*Id.*) The parties appear to agree that this maintenance services feature entitled Fairview to upgraded versions of the software. (Am. Compl. ¶ 43 ("Fairview was entitled to receive updated versions of the Active Roles software by virtue of the licenses it purchased in 2004." (citing sections 1(e), (2), and (10) of the 2004 SLA)); Answer & Countercl. ¶ 19 ("[D]uring the maintenance period, maintained licensees are entitled to upgrade their licensed software to the most recent version that has been released at no additional cost.").)

The 2004 SLA also included a "Usage Verification" provision, which the parties have referred to as a "true-up provision." The true-up provision entitled Quest to audit Fairview's deployment of the Active Roles software, and provided that:

> If Licensee's use of the Software is found to be greater than contracted for, Licensee will be invoiced for the additional licenses or license upgrades

(based on the applicable units of measure, e.g., servers, server tiers or users) and the unpaid license fees shall be payable in accordance with this Agreement. Additionally, if the unpaid fees exceed five percent (5%) of the license fees paid for the subject Software, then Licensee shall also pay Quest's reasonable costs of conducting the audit.

(2004 SLA § 16.) The 2004 SLA also stated that "[n]either this Agreement nor any Quotation Form may be modified or amended except by a writing executed by a duly authorized representative of each party." (*Id.* § 17(j).)

Fairview regularly purchased additional licenses in the following years until it acquired a total of 38,081 licenses by January 2016. (Am. Compl. ¶ 17.) It is alleged that Fairview signed a Support Renewal Quotation every year in order to extend the annual maintenance services it received. (*Id.* ¶ 18.)

### B.     2013 Software Transaction Agreement

In 2013, Active Roles version 6.9 was released and Quest, then operating as Dell Software, began using the standard-form 2013 Software Transaction Agreement. (Answer & Countercl. ¶ 21; *id.*, Ex. 2 ("2013 STA").) The 2013 STA granted a "non-exclusive, nontransferable . . . and non-sublicensable license to access and use the quantities of each item of Software identified in the applicable Order." (2013 STA § 2(a).) Where the software was installed on the customer's own equipment, the license was perpetual. (*Id.* § 2(b).) As with the 2004 SLA, the 2013 STA provided for annual maintenance services which entitled the customer to new versions of the Active Roles software. (*Id.* § 10.) And like the 2004 SLA, the 2013 STA included a true-up provision:

If Customer's deployment of the Software . . . is found to be greater than its purchased entitlement to such Software, Customer will be invoiced for the over-deployed quantities at Dell's then current list price plus the applicable

> Maintenance Services and applicable over-deployment fees. All such amounts shall be payable in accordance with this Agreement. Additionally, if the unpaid fees exceed five percent (5%) of the fees paid for the applicable Software, then Customer shall also pay Dell's reasonable costs of conducting the audit.

(*Id.* § 15.) The 2013 STA also included the following forum-selection clause, which Quest seeks to enforce in its Motion to Transfer Venue:

> Any action seeking enforcement of this Agreement or any provision hereof shall be brought exclusively in the state or federal courts located in Travis or Williamson County, Texas.

(*Id.* § 17(a).)

Quest asserts that Fairview agreed to be bound by the 2013 STA when it signed several purchase quotations. In 2015, Fairview signed a quotation to purchase another 1,000 licenses, along with maintenance services for those 1,000 licenses. (Answer & Countercl., Ex. 3 ("2015 Quotation").) The quotation provided that:

> CUSTOMER'S SIGNATURE ON THIS QUOTATION CONSTITUTES CUSTOMER'S COMMITMENT TO PURCHASE THE PRODUCTS SET FORTH ABOVE PURSUANT TO THE TERMS AND CONDITIONS OF THE [2013 SOFTWARE TRANSACTION AGREEMENT], WHICH IS INCORPORATED HEREIN BY REFERENCE. THIS QUOTATION AND THE AGREEMENT(S) REFERENCED HEREIN CONTAIN THE ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND SUPERSEDE ANY AND ALL OTHER AGREEMENTS AND COMMUNICATIONS, WRITTEN OR ORAL, EXPRESS OR IMPLIED WITH RESPECT THERETO.

(*Id.* at 3.) Fairview also signed a second quotation in 2015, which included the same language, for another 1,700 licenses and maintenance services for those licenses. (Williams Decl. [Doc. No. 30], Ex. A, at 2.) And in 2017, Fairview signed another quotation renewing

maintenance services for 38,101 licenses. (Answer & Countercl., Ex. 4 ("2017 Quotation").) This quotation included slightly different language from the 2015 quotations:

> Maintenance Services for the One Identity Products set forth above will be provided by One Identity under the terms of the agreement [sic] pursuant to the terms and conditions of the [2013 Software Transaction Agreement] . . . .

(*Id.* at 3.) Similarly, in 2018, Fairview signed a Support Renewal Quotation extending maintenance services for all of its licenses. (Rock Decl., Ex. B ("2018 Quotation").) The quotation provided that:

> Maintenance Services are as described on https://www.oneidentity.com/support and are subject to the terms and conditions under which the licenses covered by the Maintenance Services were purchased.

(*Id.* at 2.) Finally, Quest contends that when Fairview installed Active Roles version 6.9 on its computer systems in 2016, it was prompted (and required) to view and accept the 2013 STA. (Am. Compl. ¶ 40.)

Notably, the pleadings do not fully account for all 38,081 licenses Fairview purchased between 2004 and 2016. As noted above, Fairview alleges that it purchased a total of 38,081 licenses by January 2016. (*Id.* ¶ 17.) Fairview purchased 18,101 of those licenses in 2004 and 2005, and another 2,700 licenses in 2015. (*Id.*; *see* 2015 Quotation.) But the pleadings do not identify when the remaining 17,280 licenses were purchased. However, the 2017 and 2018 quotations indicate that those licenses had been purchased prior to 2015. Those quotations each included three line-items: (1) maintenance services for 35,381 licenses, (2) maintenance services for 1,700 licenses, and (3) maintenance services for 1,000 licenses. (2017 Quotation at 2; 2018 Quotation at 1.) Because the latter two entries correspond to the two transactions in 2015, a reasonable inference can be drawn

that all of the 35,381 licenses in the first entry had been purchased prior to the 2015 transactions. But that conclusion does not itself entail that the unaccounted-for 17,280 licenses were purchased under the 2004 SLA, nor does it show that the licenses were purchased under the 2013 STA. Accordingly, the Court will not consider the unaccounted-for licenses in its transfer analysis at this stage.

## II.     DISCUSSION

### A.     Standard of Review

Quest, invoking the forum-selection clause in the 2013 STA, moves to transfer venue to the United States District Court for the Western District of Texas pursuant to 28 U.S.C. § 1404(a). Under § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "Although a forum-selection clause does not render venue in a court 'wrong' or 'improper' . . . , the clause may be enforced through a motion to transfer under § 1404(a)." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 59 (2013). In evaluating a motion under § 1404(a) premised on a forum-selection clause, the Court must engage in a three-step inquiry. "First, the Court must determine whether the District Court of Minnesota is a proper venue, without regard to the forum-selection clause. . . . Second, the Court must determine the validity of the forum-selection clause. If the clause is valid, then third and finally, the Court must weigh a series of factors to determine the enforceability of the clause." *Rogovsky Enter., Inc. v. Masterbrand Cabinets, Inc.*, 88 F. Supp. 3d 1034, 1040–41 (D. Minn. 2015).

Fairview moves to dismiss Quest's first and second counterclaims under Federal Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss a counterclaim under Rule 12(b)(6), the Court accepts the facts alleged in the counterclaim as true, and views those allegations in the light most favorable to the counterclaimant. *See Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). However, the Court need not accept as true wholly conclusory allegations or legal conclusions couched as factual allegations. *Id.* In addition, the Court ordinarily does not consider matters outside the pleadings on a motion to dismiss. *See* Fed. R. Civ. P. 12(d). The Court may, however, "consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010)).

To survive a motion to dismiss, a counterclaim must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a counterclaim need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

In order to evaluate both parties' motions, the Court must examine the 2004 SLA, the 2013 STA, and several purchase quotations signed by the parties. The Court finds that it may consider these documents at this stage, because they have either been attached as exhibits to Fairview's Amended Complaint or to Quest's Answer and Counterclaim, or are

"materials embraced by the pleadings." *Illig*, 652 F.3d at 976. However, to the extent the Court is required to interpret the applicable agreements, it may do so only insofar as the documents are unambiguous. *See Minnesota Vikings Football Stadium, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 193 F. Supp. 3d 1002, 1011 (D. Minn. 2016) ("The interpretation of an unambiguous contract is a question of law . . . ."). With the foregoing standards in mind, the Court first turns to Quest's Motion to Transfer Venue.

**B.      Motion to Transfer Venue**

Quest seeks transfer based solely on the forum-selection clause in the 2013 STA. As noted above, in evaluating a motion to transfer venue based on a forum-selection clause, the Court must engage in a three-step inquiry. "First, the Court must determine whether the District Court of Minnesota is a proper venue, without regard to the forum-selection clause. . . . Second, the Court must determine the validity of the forum-selection clause. If the clause is valid, then third and finally, the Court must weigh a series of factors to determine the enforceability of the clause." *Rogovsky Enter., Inc.*, 88 F. Supp. 3d at 1040–41. The parties do not dispute that the District of Minnesota is a proper venue, nor does Fairview argue that the forum-selection clause is invalid. Rather, Fairview argues that the forum-selection clause does not apply to this dispute. Because "[a] forum-selection clause must be applicable before it can be enforceable," the Court must determine whether the 2013 STA's forum-selection clause applies to this matter. *Civil Ag Grp., Inc. v. Octaform Sys., Inc.*, 267 F. Supp. 3d 1112, 1115 (D. Minn. 2017) (collecting cases). In conducting that inquiry, the Court "must interpret the language of the clause, which is done according

to the plain language of the contract and the intent of the parties as expressed in the disputed clause." *Id.* (citations omitted).

The disputed forum-selection clause applies to "[a]ny action seeking enforcement of this Agreement or any provision hereof." (2013 STA § 17(a).) Fairview argues that its declaratory judgment action does not "seek[] enforcement of" the 2013 STA; indeed, Fairview maintains that the 2004 SLA, not the 2013 STA, governs the parties' licensing dispute. In response, Quest argues that the 2013 STA superseded the 2004 SLA, and that Quest's counterclaim for breach of the 2013 STA renders this action one "seeking enforcement of" the 2013 STA.

In order to determine whether this is an "action seeking enforcement of" the 2013 STA, the Court must first examine the extent to which the 2013 STA governs the parties' relationship. Initially, Fairview purchased at least 18,101 Active Roles licenses pursuant to the 2004 SLA. (Am. Compl. ¶ 17.) These licenses were perpetual, unlike the annual maintenance services component of the transaction. (*See* 2004 SLA §§ 2, 10.) Quest argues that the 2004 SLA could not apply to Fairview's deployment of the Active Roles version 6.9 software, because that version did not exist in 2004. However, the 2004 SLA, by its plain terms, entitled Fairview to "new versions and releases of the Software" as part of the maintenance services component of the transaction—and Quest has admitted that proposition. (*Id.* § 10; Answer & Countercl. ¶ 19 ("[D]uring the maintenance period, maintained licensees are entitled to upgrade their licensed software to the most recent version that has been released at no additional cost.").)

11

Quest contends that Fairview later agreed to the 2013 STA by signing several purchase quotations. In 2015, Fairview signed two quotations, totaling 2,700 licenses. (2015 Quotation; Williams Decl., Ex. A.) The quotation forms each listed two line-items: one for the quantity of new licenses purchased, and one for a commensurate amount of maintenance services. (*See* 2015 Quotation at 2.) The quotations also stated:

> CUSTOMER'S SIGNATURE ON THIS QUOTATION CONSTITUTES CUSTOMER'S COMMITMENT TO PURCHASE **THE PRODUCTS SET FORTH ABOVE** PURSUANT TO THE TERMS AND CONDITIONS OF THE [2013 SOFTWARE TRANSACTION AGREEMENT], WHICH IS INCORPORATED HEREIN BY REFERENCE. THIS QUOTATION AND THE AGREEMENT(S) REFERENCED HEREIN CONTAIN THE ENTIRE AGREEMENT BETWEEN THE PARTIES **WITH RESPECT TO THE SUBJECT MATTER HEREOF** AND SUPERSEDE ANY AND ALL OTHER AGREEMENTS AND COMMUNICATIONS, WRITTEN OR ORAL, EXPRESS OR IMPLIED **WITH RESPECT THERETO**.

(*Id.* at 3 (emphasis added).) Thus, the 2013 STA unambiguously applied at least to the 2,700 additional licenses purchased in 2015.

The next question is whether the 2015 quotations also superseded the 2004 SLA with respect to the (at least) 18,101 licenses Fairview had already purchased. The emphasized language above makes clear that insofar as the 2015 quotations bound Fairview to the 2013 STA, they did so only with respect to the 2,700 licenses purchased in 2015. Neither quotation mentioned the thousands of perpetual licenses Fairview had already purchased. Rather, the quotations stated only that Fairview purchased "the products set forth above [namely, the 2,700 licenses and corresponding maintenance services] pursuant to" the 2013 STA, and that the 2013 STA "supersede[s] any and all other agreements . . . with respect thereto." (*Id.*) The Court finds that the 2015 quotations

unambiguously bound Fairview to the 2013 STA with respect to the 2,700 licenses purchased in 2015, but did not supersede the 2004 SLA with respect to previously purchased licenses.

Quest also points to the 2017 purchase quotation and the 2018 Support Renewal Quotation. In the 2017 quotation, Fairview agreed that the "Maintenance Services for the One Identity Products set forth above," which included all 38,101 licenses, "will be provided by One Identity . . . pursuant to the terms and conditions of the [2013 Software Transaction Agreement]." (2017 Quotation at 3.) Thus, under the 2017 quotation, the maintenance services provided in 2017 were governed by the 2013 STA. But the parties' dispute revolves around the licenses granted in § 2 of the 2004 SLA and 2013 STA, and the true-up provisions found in § 15 and § 16 of those agreements—not the maintenance services provided for in § 10 of the agreements. Because the parties' dispute does not pertain to the maintenance services provided in 2017, the 2017 quotation does not entail that the 2013 STA's forum-selection clause applies to this action.

Similarly, the 2018 Support Renewal Quotation renewed Fairview's maintenance services, "subject to the terms and conditions under which the licenses covered by the Maintenance Services were purchased." (2018 Quotation at 2.) Thus, the maintenance services provided in 2018 were governed by both the 2004 SLA, with respect to the (at least) 18,101 licenses purchased under the 2004 SLA, and the 2013 STA, with respect to the 2,700 licenses purchased in 2015. But, again, that Fairview agreed to the 2013 STA with respect to some of the maintenance services purchased in 2018 does not entail that the 2013 STA wholly displaced the 2004 SLA. And because the parties' dispute does not

pertain to the maintenance services provided in 2018, the 2018 Support Renewal Quotation does not subject this action to the 2013 STA's forum-selection clause.

Finally, Quest argues that Fairview was required to review the 2013 STA and click "agree" while installing the Active Roles version 6.9 software update on its computer systems. But the 2004 SLA, by its terms, may not be "modified or amended except by a writing executed by a duly authorized representative of each party." (2004 SLA § 17(j).) The click-wrap agreement allegedly executed by Fairview has not been presented to the Court, and the limited record available at this stage does not establish that the agreement constitutes a "writing executed by a duly authorized representative" of Fairview. Accordingly, it is unclear whether the click-wrap agreement caused the 2013 STA to supersede the 2004 SLA with respect to the licenses purchased under the 2004 SLA.

In sum, based on the limited record available at this stage of the proceedings, the Court can only conclude that the 2013 STA governs 2,700 of Fairview's 38,081 licenses. Because Fairview's declaratory judgment claims do not "seek[] enforcement of" the 2013 STA and Quest's counterclaims based on the 2013 STA pertain to such a small sliver of the dispute, the Court cannot yet say that this is an "action seeking enforcement of" the 2013 STA. Accordingly, the Court finds that the record at this stage does not support transfer, and denies Quest's motion.

### C.      Motion to Dismiss

The Court next turns to Fairview's Motion to Dismiss Quest's counterclaims for breach of the 2013 STA and for copyright infringement. In reviewing this motion, the Court must accept the facts alleged in Quest's counterclaim as true and view those facts in the

light most favorable to Quest. *See Hager v. Arkansas Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013). For purposes of this motion, the Court assumes that the 2013 STA governs Fairview's alleged over-deployment of Active Roles licenses.

Regarding Quest's breach of contract claim, Fairview argues that exceeding its allowed licenses does not constitute breach under the plain terms of the contract. In support of this argument, Fairview points to the contract's true-up provision:

> If Customer's deployment of the Software . . . is found to be greater than its purchased entitlement to such Software, Customer will be invoiced for the over-deployed quantities at Dell's then current list price plus the applicable Maintenance Services and applicable over-deployment fees.

(2013 STA § 15.) Fairview argues that because the agreement contemplated that Fairview might over-deploy the Active Roles software and provided a mechanism for compensating Quest in the event of such an over-deployment, over-deployment does not constitute a breach of the contract. However, Quest's breach of contract counterclaim is not premised merely on the allegation that Fairview deployed the software to more accounts than permitted by its license. Rather, the gravamen of Quest's breach of contract claim is that Fairview refused to pay for the alleged over-deployment, as required by the true-up provision.[1] The Court finds that Quest has plausibly alleged that Fairview failed to pay as

---

[1] To be sure, Quest's Answer and Counterclaim alleges simply that "Fairview has breached the 2013 STA by deploying Active Roles 6.9 software to . . . more enabled user accounts than allowed by Fairview's license entitlement." (Answer & Countercl. ¶ 44.) However, in this posture the Court must view the pleadings in Quest's favor, and construes the Answer and Counterclaim to match Quest's theory of breach: That by exceeding its allowed licenses and refusing to pay pursuant to the true-up provision, Fairview breached the 2013 STA.

required by the true-up provision, and therefore denies Fairview's motion to dismiss Quest's counterclaim for breach of contract.

Fairview also moves to dismiss Quest's counterclaim for copyright infringement. In order to establish copyright infringement, a copyright holder must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Although "[a] copyright owner who grants a nonexclusive, limited license ordinarily waives the right to sue licensees for copyright infringement," the copyright owner may recover for infringement if "(1) the copying . . . exceed[s] the scope of the defendant's license and (2) the copyright owner's complaint [is] grounded in an exclusive right of copyright (e.g., unlawful reproduction or distribution)." *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 939–40 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011) (citations omitted). In order for a licensee's violation of a licensing agreement to constitute copyright infringement, the contractual provision violated must constitute a condition on the scope of the license, and "there must be a nexus between the condition and the licensor's exclusive rights of copyright." *Id.* at 941.

The parties do not dispute that Quest has plausibly alleged ownership of a valid copyright to the Active Roles software. Rather, Fairview argues that Quest has not plausibly alleged infringement because, by virtue of the true-up provision, over-deployment of the software does not exceed the scope of Fairview's license. Fairview relies primarily on *Quest Software, Inc. v. DirecTV Operations, LLC*, in which the court held that a similar true-up provision in Quest's contract with another of its clients constituted a

contractual covenant, not a condition limiting the contract's scope. No. SACV 09-1232 AG ANX, 2011 WL 4500922, at *4 (C.D. Cal. Sept. 26, 2011). But the contract at issue in that case expressly gave the defendant the right to exceed the number of licenses granted in the contract. *See id.* at *8 ("Under the terms of the License Agreement, Defendant had the 'right to increase the aggregate number of CPU's . . . by up to 10% per product . . . at no additional fee.' Defendant could exceed this 10% threshold on the condition that it paid Plaintiff additional license fees."). By contrast, the 2013 STA granted Fairview a license only to "the quantities of each item of Software identified in the applicable Order." (2013 STA § 2(a).) While the true-up provision provided a remedy should Fairview be found to exceed that quantity, the true-up provision did not expressly give Fairview the *right* to do so. (*See id.* § 15.) Thus, Quest has plausibly alleged that by exceeding the numerical limitation on Fairview's licenses, Fairview exceeded the scope of its license.

Fairview also contends that Quest has not plausibly alleged a nexus between the license's numerical limitation and Quest's exclusive rights. *See MDY Indus., LLC*, 629 F.3d at 941 ("[F]or a licensee's violation of a contract to constitute copyright infringement, there must be a nexus between the condition and the licensor's exclusive rights of copyright."). But Quest has alleged that Fairview used more copies of its copyrighted work than it purchased, and has not paid for the excess use as provided for by the true-up provision. Consequently, Quest has plausibly alleged the required nexus between the numerical limitation in its contract and Quest's exclusive rights. *See id.* at 941 n.4 ("A licensee arguably may commit copyright infringement by continuing to use the licensed work while failing to make required payments, even though a failure to make payments

17

otherwise lacks a nexus to the licensor's exclusive statutory rights."); *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*, 421 F.3d 1307, 1316 (Fed. Cir. 2005) ("[C]onsider a license in which the copyright owner grants a person the right to make one and only one copy of a book . . . . Obviously, a licensee who made a hundred copies of the book would be liable for copyright infringement because the copying would violate the Copyright Act's prohibition on reproduction and would exceed the scope of the license.").

Accordingly, the Court finds that Quest has plausibly alleged that Fairview's asserted over-deployment constitutes copyright infringement, and therefore denies Fairview's motion to dismiss Quest's infringement counterclaim.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Transfer Venue [Doc. No. 27] and Plaintiff's Motion to Dismiss [Doc. No. 21] are **DENIED**.

**IT IS SO ORDERED.**

Dated: February 22, 2021                              s/Susan Richard Nelson
                                                      SUSAN RICHARD NELSON
                                                      United States District Judge